IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| IRAN B. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-606-WKW |
| | ) | [WO] |
| ALABAMA DEPARTMENT OF CORRECTIONS and KIM T. THOMAS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Iran B. Williams brings this action against his former employer, the Alabama Department of Corrections ("ADOC") and Commissioner Kim T. Thomas, alleging a racially discriminatory termination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e-17 ("Title VII"), and 42 U.S.C. §§ 1981, 1983, and 1985. Before the court is Defendants' motion for summary judgment (Doc. # 24) to which Mr. Williams has filed a response in opposition (Doc. # 26). After careful consideration of the arguments of counsel, the appropriate law, and the evidence, the court finds that the motion for summary judgment is due to be granted.

## I.   JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 42 U.S.C. § 2000e-5(f)(3).  The parties do not contest personal jurisdiction or venue.

## II.   STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that

2

a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

### III. BACKGROUND

Mr. Williams has had two stints of employment with the ADOC as a correctional officer: a period from July 19, 1997, to September 2, 1999; and a period from June 16, 2009, to November 18, 2011. Both stints ended in termination. In this lawsuit, Mr. Williams, a black male, alleges that his second termination was racially discriminatory.

During his second stint of employment, Mr. Williams worked at Staton Correctional Facility in Elmore County, Alabama, under the supervision of Warden Leon Forniss. Although his performance reviews during this time generally yielded ratings of "Meets Standards," Mr. Williams accumulated five disciplinary actions within a nineteen-month period. He received two warnings and one written reprimand for tardiness (February 26, 2010, March 11, 2011, and September 26, 2011), a written reprimand stemming from a verbal altercation

between Mr. Williams and an onsite nurse (August 24, 2010), and a three-day suspension for use of excessive force against an inmate (September 12, 2010). He also had a pending suspension for reporting late to work on July 2, 2011, which presumably remained unresolved in light of his subsequent termination. It was Mr. Williams's second offense for the use of excessive force against an inmate, compounded by his cumulative disciplinary record, that got him fired.

Each of the two incidents involving Mr. Williams's use of excessive force against an inmate was the subject of an internal investigation.[1] As to the first incident, which occurred on March 30, 2010, the investigation concluded that Mr. Williams struck an inmate with a baton in the leg without justifiable cause and failed to file an incident report documenting his use of force. Mr. Williams received a three-day suspension for this offense, effective September 12–14, 2010. The second excessive force incident occurred on July 17, 2011. An investigation concluded that, during a confrontation with an inmate concerning the inmate's possession of contraband (*i.e.*, a cell phone charger), Mr. Williams hit the inmate on the side of his head with an open hand three times and also failed to file an incident report. (ADOC Investigative Report (Doc. # 24-2, at 16–17).) The use of force again was found to be unjustified.

---

[1] The two incidents of excessive force require more discussion because, as discussed later, Mr. Williams contends that a white correctional officer, Derrick Hines, is a similarly situated employee who also engaged in two incidents of excessive force against an inmate, but was not terminated.

4

Both investigations concluded that Mr. Williams had violated multiple standards under the ADOC's Administrative Regulation No. 208 and, in particular, that he had committed the infraction set out in Annex H, Number 30, prohibiting "[a]busive or excessive physical force in dealing with inmates." (ADOC Admin. Reg. No. 208 & Annex H (Doc. # 24-3).) Administrative Regulation No. 208, Annex H, provides that the next step in progressive discipline for Mr. Williams's second infraction for the use of unjustified force against an inmate is dismissal.[2]

After the investigation of the July 17, 2011 incident, and having obtained the required approval from his superiors, Warden Forniss set in gear the disciplinary machinery for Mr. Williams's dismissal. (*See* Exhibits (Doc. # 24-5, at 7–10).) On October 3, 2011, Warden Forniss issued Mr. Williams a Notice of Pre-Dismissal Conference, outlining Mr. Williams's July 17, 2011 misconduct, his

---

[2] Consistent with the level of discipline recommended in Annex H, Mr. Williams received a three-day suspension for his first offense of excessive physical force in dealing with inmates. It is helpful at this point to discuss briefly the ADOC's categorization of inactive and active corrective actions. Mr. Williams's first offense for excessive physical force against an inmate remained an "active corrective action" on July 17, 2011, when Mr. Williams committed his second infraction for the same conduct. Under ADOC's disciplinary scheme, an "active corrective action" is a "corrective action issued within the previous 12 month period," as opposed to an "inactive corrective action" that is one that "was finalized/served on an employee more than 12 months prior to the action being contemplated." (ADOC Admin. Reg. No. 208, at 6–7.) Mr. Williams's first incident involving the use of excessive force on an inmate occurred on March 30, 2010, but was not considered "finalized" until September 12, 2010 (the first date of the suspension); therefore, under the ADOC's interpretation of its rules, the first excessive-force incident occurred within the twelve-month window preceding Mr. Williams's second use of excessive force against an inmate on July 17, 2011. ADOC Administrative Regulation No. 208 provides that when recommending dismissal, the warden "shall consider . . . [a]ll active and inactive corrective actions." (ADOC Admin. Reg. No. 208, at 8.) In his appeal to the State Personnel Board, Mr. Williams challenged the ADOC's interpretation of its regulation defining "active corrective action," but that challenge was rejected. He does not reignite that challenge in this lawsuit.

overall disciplinary record, the ADOC standards allegedly violated, and that the recommendation for dismissal was based upon "[a]busive or excessive physical force in dealing with inmates." (Notice of Pre-Dismissal Conference (Doc. # 24-2, at 18–19); ADOC Admin. Reg. No. 208.) At the conference held on October 12, 2011, Mr. Williams submitted written documentation in mitigation of the proposed dismissal. Warden Forniss nonetheless maintained that the "recommendation for dismissal be upheld based on the fact that this is Officer Williams['s] second offense of abuse or excessive force used in dealing with inmates." (Oct. 12, 2011 Mem. from Warden Forniss to Comm'r Thomas (Doc. # 24-2, at 20–24).) Subsequently, Commissioner Thomas notified Mr. Williams in a letter dated November 9, 2011, of his termination. In the letter, Commissioner Thomas articulated that he had reviewed the warden's recommendation and supporting documentation, as well as Mr. Williams['s] "overall work record." (Nov. 9, 2011 Letter from Comm'r Thomas to Mr. Williams (Doc. # 24-5, at 13–15).) The termination was effective November 18, 2011.

    Mr. Williams appealed his dismissal to the Alabama State Personnel Board and received a hearing before an administrative law judge on March 20, 2012. On May 9, 2012, the administrative law judge recommended to the State Personnel Board that it uphold Mr. Williams's dismissal. On June 20, 2012, the State Personnel Board affirmed Mr. Williams's termination. Adopting the

administrative law judge's findings of fact and conclusions of law, the State Personnel Board highlighted the facts that Mr. Williams struck an inmate "on the side of the head with an open hand" multiple times on July 17, 2011, and then unsuccessfully tried to persuade a witnessing officer "to lie about what he had seen," "did not file an incident report," and "initially denied using any force against the inmate when questioned about the incident." (State Pers. Bd. Order (Doc. # 24-1, at 181–82).) Based upon the totality of the evidence, which also included Mr. Williams's overall work history, the State Personnel Board concluded that Commissioner Thomas's decision "to dismiss [Mr. Williams] [was] supported by the evidence and that termination was warranted." (State Pers. Bd. Order 180–83.)

Mr. Williams filed this lawsuit on August 26, 2013, against the ADOC and Commissioner Thomas, challenging his termination. The Complaint alleges disparate treatment based upon race in violation of Title VII (Count I), 42 U.S.C. §§ 1981 (Counts II & III), 1983 (Count IV), and 1985 (Count V).

After discovery, Defendants filed their motion for summary judgment on April 25, 2014. Mr. Williams timely responded in opposition on May 16, 2014.

## IV. DISCUSSION

The discussion proceeds in three parts. Part A explains why an independent § 1981 claim against a state actor is not viable, merges the § 1981 claim with the

7

§ 1983 claim, and discusses the interplay among Mr. Williams's claims brought under § 1981/§ 1983 and Title VII. Part B addresses the merits of those claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Part C addresses Mr. Williams's § 1985 conspiracy claim. For the reasons articulated in Parts B and C, the claims fail to survive Defendants' motion for summary judgment.

**A.   The Interplay Among § 1981, § 1983, and Title VII in the Public Employment Context**

   **1.   *§ 1981***

Counts II and III of the Complaint allege § 1981 racial discrimination claims against Defendants. Defendants contend that § 1983 is the "exclusive remedy for civil rights violations committed by state actors" and that, therefore, summary judgment in their favor is appropriate as to Counts II and III. (Doc. # 24, at 15.) Mr. Williams has not rebutted Defendants' contention, which embodies a correct statement of the law.

Where a plaintiff seeks vindication of rights secured by § 1981 against a state actor, § 1983 provides the exclusive remedy for obtaining relief. *Butts v. Cnty. of Volusia*, 222 F.3d 891, 893 (11th Cir. 2000) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731–32 (1989)); *see also Moore v. Ala. Dep't of Corr.*, 137 F. App'x 235, 237 (11th Cir. 2005) (citing *Butts* for the proposition that "in a case involving state actors, there is no liability under § 1981, and such claims

8

merge into the § 1983 claims"). Mr. Williams "could have sued under § 1983 for the violation of § 1981," but as the plaintiff in *Butts*, "he chose not to do so." 222 F.3d at 892. Instead, Mr. Williams brought separate counts for the alleged violations of § 1981 and § 1983. Based upon the holding in *Butts*, § 1981 does not provide a cause of action against Defendants. Although summary judgment is appropriate on Counts II and III on the reasoning in *Butts*, the court will merge Counts II and III with Count IV, which is the § 1983 claim. The § 1981 and § 1983 counts, which collectively contest Mr. Williams's termination as racially discriminatory, will be analyzed together under the standard set forth below.

   2.   *Title VII and § 1983*

Counts I and IV of the Complaint allege that Mr. Williams's termination was racially discriminatory in the disparate treatment context in violation of Title VII and the Fourteenth Amendment's Equal Protection Clause as enforced by § 1983. The Eleventh Circuit has explained that "the analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008); *see also Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1314 n.6 (11th Cir. 2000) (noting that substantive law and proof requirements of Title VII and § 1983 are the same for claims alleging intentional employment discrimination based on race by state actors). The facts are the same here, and, because the Title VII and

§ 1983 claims rest on circumstantial evidence, the *McDonell Douglas* burden-shifting framework applies. Mr. Williams's § 1983 and Title VII claims share, therefore, a common analytical framework, making it appropriate to analyze them together.[3] This opinion refers to Title VII with the understanding that the analysis also applies to the merged § 1981/§ 1983 claim.

B. **Title VII Claim Alleging a Racially Discriminatory Termination**

Under the *McDonnell Douglas* framework, the plaintiff first must establish a prima facie case of discrimination. Where a plaintiff alleges a discriminatory termination, he may establish a prima facie case by showing that (1) he is a member of a protected class, (2) he was qualified for his position, (3) he was subject to an adverse employment action, and (4) his employer treated similarly situated employees outside his protected class more favorably. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

If the plaintiff establishes a prima facie case of discrimination, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its

---

[3] Under Title VII, any relief granted "'is against the *employer*, not individual employees whose actions would constitute a violation of the Act.'" *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (emphasis in original) (quoting *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)). Commissioner Thomas is not a proper party, therefore, to the Title VII claim.

actions." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). If the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id.* The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

    **1.** *Prima Facie Case*

Only the fourth element of the prima facie case is in dispute. A proper comparator is a non-minority employee who is "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562; *accord Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008). "In order to be considered 'similarly situated,' the compared employees must have been 'involved in or accused of the same or similar conduct,' yet 'disciplined in different ways' for that conduct." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (citing *Holifield*, 115 F.3d at 1562); *see also Maniccia*, 171 F.3d at 1364 ("The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed."). The Eleventh Circuit has interpreted this standard to "require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-

11

guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368.

Mr. Williams offers evidence of one potential comparator: Derrick Hines, a white correctional officer who also engaged in two separate incidents of excessive force against an inmate, but who was suspended rather than terminated. Focusing on a comparison of the misconduct, Defendants contend that Mr. Williams cannot show that Mr. Hines is similarly situated because Mr. Williams, unlike Mr. Hines, "failed to report his incidents to his supervisors" and attempted to enlist another officer to lie on his behalf. (Doc. # 24, at 12.) In addition, Defendants argue that Mr. Hines and Mr. Williams are not similarly situated because Mr. Williams earned less favorable performance evaluations and was subject to more prior disciplinary actions than Mr. Hines. Defendants also point out that Mr. Williams and Mr. Hines worked at different correctional facilities under the supervision of different wardens, and that Mr. Williams previously had been terminated by the ADOC.

Mr. Williams responds that he and Mr. Hines are similarly situated because "both were correctional officers, both supervised inmates and both were subject to [Administrative Regulation No.] 208." (Doc. # 26, at 9.) Mr. Williams complains that, notwithstanding that the ADOC found that Mr. Hines was involved in two

12

incidents of excessive force against inmates, Mr. Hines received "one suspension of three days" (Doc. # 26, at 4), while Mr. Williams was terminated.

Mr. Williams is correct that, at all relevant times, he and Mr. Hines were correctional officers who supervised inmates and that investigations concluded that he and Mr. Hines had on two separate instances used unjustified force against an inmate. There are at least four key differences between Mr. Hines and Mr. Williams, however, that render them dissimilarly situated and which demonstrate that Mr. Williams's comparison is too broad for purposes of the similarly situated analysis.

First, the quality of Mr. Williams's misconduct is distinguishable from Mr. Hines's misconduct because Mr. Williams's included an element of deception. *See Maniccia*, 171 F.3d at 1369 ("Deputies Bodree, Odell, and Lane each may have carried unauthorized passengers on one occasion, but there is no evidence they lied about it as [the plaintiff] did."). On each occasion, Mr. Williams violated ADOC regulations by failing to file an incident report informing his supervisor of his use of force against an inmate, seemingly to avoid detection, whereas there is no investigative finding or other evidence that Mr. Hines similarly failed to report his use of force against inmates. Moreover, Mr. Williams initially provided a false written statement to his supervisor concerning the July 17, 2011 incident, in which he did not document any use of force against the inmate, and he also tried to

persuade a fellow officer to lie about having witnessed his use of excessive force against an inmate. There is no indication from the investigation surrounding Mr. Hines's misconduct that he engaged in deceptive tactics to cover up his use of excessive force against inmates. These differences in the quality of misconduct undermine Mr. Williams's efforts to show that his conduct is similar in all relevant respects to Mr. Hines's.

Second, disparity in the employees' disciplinary history is a relevant consideration in the similarly situated analysis. "Employees with different . . . disciplinary records are not nearly identical." *Mumfrey v. CVS Pharm., Inc.*, 719 F.3d 392, 405 (5th Cir. 2013) (citation and internal quotation marks omitted); *see also Jones v. Alabama Power Co.*, 282 F. App'x 780, 784 (11th Cir. 2008) (factoring in the proposed comparator's lack of a disciplinary record in holding that the plaintiff and the comparator were not similarly situated); *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259–62 (11th Cir. 2001) (explaining that the plaintiff's prior disciplinary misconduct was not similar in "all relevant aspects" to the misconduct of a non-minority, comparator). The recommendations for punishment for Mr. Hines and Mr. Williams factored in the officers' overall work records, and Mr. Williams and Mr. Hines had contrasting disciplinary records. Mr. Hines had no past disciplinary action in his personnel file, while Mr. Williams had two warnings and two written reprimands for prior misconduct, a pending

suspension, and significantly, an active corrective action for a three-day suspension for a prior use of excessive force against an inmate.[4] Additionally, as Defendants correctly point out, Mr. Williams's performance evaluations during his second stint of employment marginally met standards, as the administrative law judge reviewing Mr. Williams's post-termination appeal found, while Mr. Hines consistently scored in the range of "Exceeds Standards."

Third, while not dispositive, Mr. Hines and Mr. Williams worked at different ADOC facilitates under the supervision of different wardens. As in *Moore v. Alabama Department of Corrections*, the fact that different supervisors made the disciplinary recommendations for Mr. Williams and Mr. Hines "is not dispositive itself," but "it does serve to further distinguish their situations." 137 F. App'x 235, 239 (11th Cir. 2005).

Fourth and finally, it must be kept in mind that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). Mr. Williams complains that the ADOC conducted a combined investigation of Mr. Hines's two use-of-force incidents and meted out

---

[4] Additionally, as set out in Commissioner Thomas's letter notifying Mr. Williams of his termination, Mr. Williams previously had been terminated from the ADOC's employ in 1999 for an unexcused absence and sleeping on the job. (Nov. 9, 2011 Letter from Thomas to Mr. Williams (Doc. # 24-5, at 13–15).) While Mr. Hines also previously had worked for the ADOC as a correctional officer for approximately 15 months from March 2005 to June 2006, he was not terminated but rather resigned to "pursue a career in Law Enforcement." (Hines's Letter of Resignation (Doc. # 24-6, at 87).)

15

only a single punishment of suspension. Mr. Williams's argument, however, brings to light another distinguishing factor between his and Mr. Hines's misconduct. Mr. Hines's first incident of use of force, which occurred one week prior to his second, still was pending for further investigation by the ADOC's I&I Division when the second incident of use of force occurred. On the other hand, Mr. Williams's incidents of excessive force occurred some sixteen months apart, and on July 17, 2011, the date of the second incident, Mr. Williams already had served his three-day suspension for his first incident of use of excessive force. The ADOC simply may have concluded that the suspension for Mr. Williams had not been sufficiently punitive to deter further misconduct. Regardless, the temporal difference between Mr. Hines's and Mr. Williams's first and second offenses presents another distinguishing factor between the two officers' misconduct, which precludes judicial interference in the ADOC's decisions to impose different levels of punishment.

    Because Mr. Williams cannot show the existence of a valid comparator and does not present other evidence of discrimination, he fails to establish a prima facie case of discrimination. Accordingly, summary judgment is due to be entered in Defendants' favor on Mr. Williams's Title VII and §1983 claims alleging a racially discriminatory termination.

## 2. *Evidence of the ADOC's Legitimate, Non-Discriminatory Reason for Mr. Williams's Termination and the Absence of Evidence of Pretext*

Even if it is assumed that Mr. Williams could establish a prima facie case of discriminatory discharge, he fails to rebut Defendants' legitimate, nondiscriminatory reason for terminating him. Defendants contend that Mr. Williams was terminated, consistent with the recommended level of discipline in Administrative Regulation No. 208, based upon Mr. Williams's infractions for use of excessive force against inmates and his prior work history. Mr. Williams does not contest that this reason is legitimate and non-discriminatory. To rebut this reason, Mr. Williams would have to present evidence of pretext, which he has not done. The entirety of Mr. Williams's argument as to pretext also focuses on the alleged similarity between him and Mr. Hines and the disparity in discipline. That argument fails for the reasons previously discussed.

Accordingly, Mr. Williams fails to raise a genuine dispute of material fact on pretext. The absence of evidence of pretext provides an additional reason for granting Defendants' motion for summary judgment on Mr. Williams's racially discriminatory termination claim.

## C. § 1985 Conspiracy Claim

The Complaint also alleges a racially motivated conspiracy between certain ADOC officials to terminate Mr. Williams and deprive him of his Fourteenth

17

Amendment equal protection rights in violation of § 1985.[5] Under § 1985(3), Mr. Williams must prove the following:

> (1) defendants engaged in a conspiracy; (2) the conspiracy's purpose was to directly or indirectly deprive a protected person or class the equal protection of the laws, or equal privileges and immunities under the laws; (3) a conspirator committed an act to further the conspiracy; and (4) as a result, the plaintiff suffered injury to either his person or his property, or was deprived of a right or privilege of a citizen of the United States.

*Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010). "[T]he language requiring intent to deprive equal protection . . . means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971).

As grounds for summary judgment, Defendants contend, first, that Mr. Williams has not identified any individual with whom Commissioner Thomas allegedly conspired, second, that the intracorporate conspiracy doctrine bars the claim, and, third, that Mr. Williams has failed to demonstrate a violation of his rights to equal protection of the laws or that he was subject to intentional discrimination on the basis of his race. (Doc. # 24, at 19–20.)

---

[5] The Complaint does not specify the subsection of § 1985 upon which Mr. Williams relies, but § 1985(3) offers the only legal theory potentially applicable.

In his summary judgment response, Mr. Williams does not address these arguments or even mention his § 1985(3) claim.  Under Eleventh Circuit precedent, Mr. Williams's silence is tantamount to an abandonment of his § 1985(3) claim.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in [opposition to] summary judgment are deemed abandoned.").  But Defendants' third argument also is dispositive.  As discussed in Part B, Mr. Williams fails to present evidence of a non-minority, similarly situated employee and, thus, cannot show that Defendants denied him the equal protection of the laws based on his race or that he was terminated because of his race.  Summary judgment is appropriate, therefore, on the § 1985(3) claim.

## V. CONCLUSION

Defendants are entitled to summary judgment on Mr. Williams's § 1981/§1983 and Title VII claims alleging a racially discriminatory termination.  Mr. Williams fails to satisfy a prima facie case of discrimination because he cannot show that he was subject to more severe discipline than a non-minority, similarly situated employee, and, alternatively, he fails to rebut Defendants' legitimate non-discriminatory reason for his termination.  Defendants also are entitled to summary judgment on Mr. Williams's § 1985(3) claim.  Accordingly, it is ORDERED that Defendants' motion for summary judgment (Doc. # 24) is GRANTED.

A separate final judgment will be entered.

DONE this 2nd day of July, 2014.

                                                  /s/ W. Keith Watkins
                                   CHIEF UNITED STATES DISTRICT JUDGE